F I L E D

AUG 2 0 2008

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| ALEKS RECHANIK PRO SE | ) | **08CV4741** |
| Plaintiff , | ) ( | |
| v. | ) | **JUDGE MAROVICH** |
| Microsoft Corporation , | ) | **MAG.JUDGE VALDEZ** |
| A WashingtonCorporation , | ) | |
| | ) | **DEMAND FOR** |
| Defendant , | ) | **JURY TRIAL** |

## COMPLAINT

This is an action by ALEKS RECHANIK PRO SE to open Discovery in the lawsuit

in virtue of new and very serious charges against Microsoft Corporation in

infringement of Federal United States and Local Illinois Laws as civil and

criminal , by related to Microsoft Corporation v. Aleks Rechanik ,an individual

No. 04C-7687 the Honorable Judge James Moran in the United States District for

the Northern District of Illinois Eastern Division.

### I. RELATED ACTION

### LR 42 Related Case Notice

1. **Identity of Related Case**

1.1 Pursuant to Local Rule 42.2 this action is related to Microsoft Corporation v.

ERA Soft Corporation and Aleks Rechanik ,an individual No. 04C-7687 the Honorable

Judge James Moran in the United States District for the Northern District of Illinois

Eastern Division.

2. **Nature of Related**

1.2. On November 30.2004 while Aleks Rechanik ("Mr. Rechanik" or "Plaintiff") was

going to sleep (around 9-10 p.m. ),a legal process server ringing and knocked on his door. When he answered the door, he was served with a lawsuit filed by Microsoft Corporation in a federal court. By above lawsuit (No.04 C -7687) Microsoft Corporation ("Microsoft" or "Defendant") charged "Mr.Rechanik" as employee of ERA Soft Corporation ("ERA Soft corp.")"at copyrights and trademarks infringement, unfair competition, distributing counterfeit and/or infringing "Microsoft" software and /or related components even after "Microsoft" informed them of their illegal activity and requested that they cease and desist letters; illegal advertising , marketing, installing, offering, and distributing computer hardware and software, including purported "Microsoft" software."

## II. NATURE OF THE CASE

**2.1**    This is a lawsuit seeking lawful  Discovery by "Plaintiff", because in a previous court  he had been unlawfully deprived of his, and  money  damages  and equitable relief  pursuant Federal Constitutional 14 Amendment  and Federal Rule of Civil Procedure 16(b),26(b) and 26(f).This  lawsuit  seeks  to  recover compensation for the significant  damages  caused  by "Microsoft". In addition this  lawsuit  seeks  to recover punitive  damages , statutory  penalties, litigation fees  and  expenses, relief from  judgment , permanent  injunction and equitable  relief.

## III. PARTIES

### A.  Aleks  Rechanik PRO  SE

**3.1**    Plaintiff Aleks   Rechanik is single ,old , sick  man. He  is citizen of United States , reside in  Lake  Zurich, Illinois.

### B.   Defendant

**3.2**  Giant world and national wide software corporation. Defendant- Microsoft Corporation is company in the business of manufacturing and distributing software, hardware products and relative components. It headquarter is located at One Microsoft Way, Redmond, Washington . It holds and the filing hundreds of lawsuits against individuals and small business companies in federal courts across the country . The "Microsoft" monopolize and control the sale of over 90% national wide software market.

## IV. STATEMENT OF THE CASE

### A. OVERVIEW

Microsoft Corporation from 1982 until present time get lost of 99 % lawsuits against of it , most company ,that won are medium size or large corporation ,that is more than 50(fifty) cases national and word wide and by lawsuit payouts amount more than $9 billion and around of 100 (hundred) lawsuits pending. Main count of lawsuits that is patents infringement and activity an infringement of intellectual property rights from "Microsoft". Also, most of "Microsoft's" victims don't have the resources to sue. Hi-tech society and public of national wide decided, that <u>disturber No1 of intellectual property rights ,that is"Microsoft"</u>, because all business history of it , that it trouble and trouble. Of course ,because CEO of "Microsoft" said "Business is great matter, because that is great game without any rules". For repair Public Image and made "Microsoft's" it victim, one employ a number of PR (Public Relations) firms, most prominently

**Rechanik PRO SE pleadings08/v1-3**

WAGGENER Edstrom and pay about a quarter of a billion dollars a year and other PR firms many millions more to keep "Microsoft" shining in the public eye and start mystical war against large numbers of so-called "counterfeit" users ,using blessing target of protection intellectual property rights for creating most aggressive ,inhuman, mercilessness "roller of repressions ", which one crashed American democracy and good faith of American society to Congress , judges , lawyers and large business ( just between 10-21%, Harris Interactive Inc. March.2007) .

Most hard crime is impunity "(George Bernard Shaw. Irish author.)

And " Microsoft "more than 20(twenty ) years starting so-called "counterfeit" cases by lobbying Congress, judges and Mass-Media, using Judicial "holes" and bureaucracy systems (Exhibit 1). And obtained excellent results , that is very important fact, that 99% of so-called "counterfeit" cases "Microsoft" **open to small business companies or to persons** which one doesn't have the money to be effective against " Microsoft's" huge legal department , consisting of 1400 employees and has won .

 PR-company of "Microsoft" legend "with fantastic and unreal numbers of damages by "counterfeit" to U.S economy and "Microsoft"( nobody proof it and calculate), because that is impossible and was the purpose of moral-psychological pressure on public bodies, the judiciary, society and lawyers to create a guilt complex for the accused parties before the court decision and covert pressure on the court decision for closed eyes to false lawsuit , wrong evidences ,unsubstantial materials

### B. "Microsoft" have no proof of Infringement .

In above ,relatives case, there founded some information and charges from 9 (nine)

investigators, but  when Plaintiff  have analyzed those materials and investigated , got

strong conclusion, that charges are wrong  and  put it  compel  to court, for removing

charges    without verifications  from all  investigators  as  irresponsible .

And  by summary judgment "Microsoft" brought  it ,  but  just , 3(three) verifications

from  investigators , instead of  9 (nine) investigators ,like by  case. Now  will  compare

information  of those 3(three) investigators from Interrogatories of  relatives  case  and

from  Summary judgment of same  case. Name of ones : Mr.Doug  Cunningham,

Mr. Keagan  Patrick  and Mr John P.Joice.

 Mr.Doug  Cunningham :

4.1    From "First set of Interrogatories "(Exhibit 2) Mr.Doug  Cunningham,

Pinkerton Corporation ... has  knowledge of Defendant's distribution to an investigator

of  "counterfeit" Office-Pro 97 and/or  related components on or  about  December 15,

2002; and  Defendant's distribution  to  an  investigator of "counterfeit"office Pro97

and/or related  components  and  a "counterfeit"  Windows 2000 Pro COA  label, a

possibly stolen Windows 2000Pro COA  label on or  about  February 6,2003".

4.2   From "Declaration  of Mr. Doug  Cunningham  in support... motion for summary

judgment  against Defendant's" (Exhibit 3)said : "I  Doug Cunningham,declare as

follows: "I opened the package and  inspected  its  contents... to be sent to Microsoft

representative  " .

Mr. Keagan  Patrick :

4.3  From "First  set  of  Interrogatories"( Exhibit 2 ) Mr. Keagan  Patrick

National  Trademark  investigators,11444 Washington Blvd , #119 Los Angeles

California 90066, "Has knowledge of Defendant's distribution to an investigator of "counterfeit" Windows 2000Pro COA labels and "counterfeit "Microsoft Windows 98 COA labels on or about April 22,2004 ".

4.4 From"Declaration of Mr. Keagan Patrick in support ...motion for summary judgment against Defendant's say:"I Keagan Patrick, Declare as follows: "I, opened the package and inspected contents...to be sent to a Microsoft representative".(Exhibit 4).

Mr.John P. Joyce:

**4.5** From" First set of Interrogatories(Exhibit 2) . Joyce Investigative Services, P.O.Box 31241,Independence,Ohio 44131. "Has knowledge of Defendant's distribution to an investigator of "counterfeit" Windows2000 Pro COA labels and "counterfeit" Windows98 COA labels on or about September 21,2004 ".

**4.6** From "Declaration of Mr.John P. Joyce in support ...motion for summary judgment against Defendant's John P. Joyce , declare as follows: "I,opened the package and inspected its contents to be sent to Microsoft representative (Exhibit5 ). **In fact , such a conclusion is :**

**4.7 From" First set of Interrogatories " investigators acting as highly qualified experts with a high degree of awareness (stolen , counterfeit ), when do not have to bear responsibility before the law for their words , but with verifications , and that is most important fact , when this responsibility before the law for their words is they instantly lose their eloquence and their fantasy evaporates**

**immediately . And we immediately appear middleman with limited skills and**

information : " opened  package , inspected  inner stuff  by  brands, quantities  and sent  to "Microsoft " and  that is  all . Where  is knowledge  about , some counterfeit, or  something ,  nothing ; because investigator , just  middle  man  ,which  one works for  different  companies  with  different  matter  and  he isn't  expert  and  haven't any  sources estimate  quality  of  software ,  of  course. Thus, information's  from above investigators about "counterfeit "sale by  Plaintiff  that  is real  fraud .

Mr .Rechanik was falsely , recklessly, shamefully , and publicly accused  of illegal activities.

### C.  Mail  Fraud  and Wire Fraud

**5.1**  By  above  relatives lawsuit "Microsoft" argues  that  informed   and notified Mr Rechanik, by letter dated May 17,2004  that  he had distributed counterfeit Microsoft  software  and/or  components  and asked  Mr Rechanik  to cease  and  desist from  such  infringing  conduct. "Microsoft"  approves and  accuses Mr.Rechanik that  it  was  expressly  informed Mr.Rechanik  that they  were distributing counterfeit "Microsoft" items, but they were "not interested"  but  that  time does not  provide any documentary  evidence, some allegations and only.

5.2 MR. Rechanik  doesn't  have letters   "Cease  and  Desist" from "Microsoft" dated May 17,2004  or  later and  "Microsoft" brought nothing evidences or facts  about delivery those letters  to  Plaintiff , but unlawful argues  that  the reason  it  is received  and  on  the  basis of  the accused  Mr.Rechanik .

5.3 By  above  relatives lawsuit "Microsoft " argues  and  accuses  MR.Rechanik that he refused to talk on the phone with a representative "Microsoft" and respond  to  it

provocative questions, but "Microsoft". forgets that MR.Rechanik is not his slave and outlawed slavery and desire to speak and meet people then call it a legitimate right and confirmed by the Constitution of U.S. First Amendment and Anti --Discrimination Amendment Act 2001(4a) and blame for this can not be any body even "Microsoft".

5.4 "Microsoft" behavior and caused to Mr. Rechanik health damage, requires a lengthy moral and psychological treatment, and as a result he could not give businesses the necessary time and energy. "Microsoft's" conduct resulted in direct and consequential damages, loss, and harm to Mr.Rechanik in a amount to be proven at trial.

### D. Fraud , misrepresentation of Courts ,and actual possibility of Civil conspiracy

6.1    By "Stipulated Protection Order" of above relatives case, signed by counsel of Microsoft, ex-counsel of Plaintiff and district court judge, both counsels must designate "Confidential and Restricted "material by placing following legend on any such record and stamped each pages (Exhibit 6 ). By rules of above order, Plaintiff has rights of participating at Deposition of any witnesses with any "Confidential materials( Exhibit 6. P.39 ). But counsel of "Microsoft" and ex-counsel of Plaintiff's complete willful and unlawful violated those requirements of rules. Before Deposition of expert of Microsoft "( there is main witness at case), Plaintiff has notice for participating at above Deposition from ex-counsel of one (Exhibit 7 ), but 2(two) days prior of above Deposition , Plaintiff has prohibition for access to above event without of any clear explanation from ex-counsel of Plaintiff's, but with

refer to opinion of counsel of " Microsoft" about this illegal action (Exhibit 8 ).

Ex-counsel of Plaintiff's tried motivated unlawful steps by "so-called Restricted" material presented at Deposition ,but those motivation is real wrong . "Restricted" ,that is "Limit" by size or quantities of property or a facility and those facility have huge size, but "Confidential"determination is real correct for presented material (Exhibit 9 ), and Plaintiff have rights be presented there(Exhibit 6.P39).During in 3 (three) days ex-counsel of Plaintiff's was unavailable by phone, fax and on-line and nobody seek actual material , presented at "so-called" Deposition" like "counterfeit" and , of course estimated of them , and nobody seek main witness from "Microsoft" and nobody knows she was there or not. Ex-counsel of Plaintiff's appeared after Deposition of main witness from "Microsoft",Just . In fact Plaintiff get lost chance of Discovery with most important witness,because office of counsel of "Microsoft"located at high security building "Citadel" and without confirming from office, impossible get access to there.

6.2   In fact Plaintiff has rights estimated above happens like possible fact of conspiracy between "Microsoft" and ex-counsel of Plaintiff's for attempt of fraud of district court and Justice, because those actions by ex-counsel of Plaintiff's and by counsel of "Microsoft" was very "harmonious ,well coordinated , exact and made very fast. Plaintiff has a lot of consultations from other very experienced lawyers and everybody estimated above situation like very abnormal and questionable .

6.2   The more that all so-called confidential materials that were allegedly caused these very dubious behavior , "Microsoft" placed in the summary case, obtained for use by Plaintiff . There is no doubt that 'Microsoft" wanted to hide the actual

**dubious value " so-called" facts, or their complete absence, as well as very possible**

**fact to hide of absence of principal witness from "Microsoft".**

6.3 "Microsoft" business history, that is in fact, good skills of conspiracy and

infringement of law, see Criminal case of Indiana State v. Jack Abramoff

2001-2006 (fraud, conspiracy, illegal activity)/official lobbyists of "Microsoft" in

Congress/. (Exhibit 10 ).

6.4 "Microsoft" outrageous conduct ,including threats, intimidation, and

coercion , was intended to and actually caused Mr. Rechanik extreme emotional

distress .

### E.  Racketeering, willful breach of the settlement agreement and abuse of Federal Judiciary.

**7.1 "Microsoft" by above relatives case accuses Mr . Rechanik by complaint**

**alleged cause of action for copyright infringement, trademark infringement,**

**false designation of origin ,deceptive trade practices, and unfair competition by**

**lawsuit case filed on or about April 22,1999 in the United States District Court**

**for the Northern District of Ohio(case No. 1-99-cv-00965-KMO) alleging that**

**Aleks Rechanik, doing business as Altim International Trading Co .**

7.2 During the judicial inquiry Ohio cases, "Microsoft" has not provided any

evidence and won one lawsuit solely on a heavy pressure and creating unbearable

moral-psychological atmosphere around of the ex-consul Mr.Rechanik, which one

was an a depression, despair, in a panic ,have paralysis of will and a signatory to

all that wanted "Microsoft" is absolutely not agreeing on anything with the client

contrary to its will, enjoying the right to represent the client. Incidentally Ohio

District Court particularly noted the apparent lack of activity ex-consul Mr.Rechanik's .
There was real fact of visible presence of racketeering from "Microsoft" .

7.3 In fact Mr.Rechanik have settlement with "Microsoft", by **settlement agreement "Full and Final Release of All Claims"**(Exhibit 11), **where "Microsoft" was full satisfied and signed at Chicago, Illinois.** By those agreement "Microsoft" "intends and agrees that this release applies to all of its claims arising from above litigation, present and future …,compensatory of punitive damages…, claims for known or unknown injures , developments ,consequences and permanency of those damages or injures ; and there is no misunderstanding in this regard ".
Any way ,"Microsoft" willful breach of the settlement agreement and willful **accuses Mr . Rechanik by complaint of relatives lawsuit No.04 C-7687, deliberately not informing The District Court of the Settlement Agreement, committed a violation of the law than ,like abuse of Federal Judiciary.**

7.4 Plaintiff's acts form a pattern of racketeering by committing at least two acts racketeering activity , willful breach settlement agreement "**Full and Final Release of All Claims".** The predicate acts of racketeering include, but are not limited to attempted of violations of Federal RICO 18 U.S.C.§1961 and §1964.

7.5 These unlawful activities of "Microsoft" were not isolated.
The "Microsoft " racketeering ,willful breach settlement agreement "**Full and Final Release of All Claims",** and violation of abuse of Federal Judiciary conduct directly and proximately resulted in damages, including harm to Mr Rechanik health and property in an amount to be specifically proven at trial.

### F. Complete lack of legal basis

8.1    All  listed above arguments prove absolutely complete lack of legal basis
of all  claims  by "Microsoft"  by lawsuit  No 04 C -7687.

8.2  "Microsoft" willful  introduced in  the  lawsuit  No 04 S-7687  absolutely
false accusations  and  intentionally  tried  to  present them as credible. "Microsoft"
action. worthy of every  condemnation  Decent  and  Punishment .

8.4    "Microsoft" willful caused enormous and  largely  incorrigibility  damage  to
health  Mr.Rechanik , his property, name, personal life, career  and  personal  reputation
an amount  to  be  specifically  proven  at trial .

## V . PRAYER FOR RELIEF

**Wherefore , the plaintiff prays for  :**

1.  Dismissal  all of the  Plaintiff's  claims  with prejudice.

2. An order that plaintiff's  shall take  no  relief from their  complaint herein.

3.  All direct  and  consequential damages .

4.  Declaratory  and  Injunctive  relief .

5 .Statutory  and  punitive  damages  awardable  under 815 ILCS 510/1 .

6.Attorney's fees, all  expenses  relatives with  cases  proceedings  and  costs
   awardable  under  17 U.S.C. § 505.

7.    7.For post- judgment  interest  on the entire  judgment  until  paid  in full .

8. For  such other and  further relief as the Court may deem  just and equitable.

## DEMAND FOR JURY TRIAL

Respectfully submitted this 19th day of August,2008.

Aleks Rechanik PRO SE
1216 Thorndale lane
Lake Zurich ,IL 60047

By:  /s/ Aleks  Rechanik

Exhibit  1

Print Version                                                                    Pa

Click here to print

# Microsoft's lawsuit payouts amount to around $9 billion

14 Jul 2005 | 14:35 BST

By Désiré Athow

Updated Twice the GDP of Cambodia
* **UPDATE** Additional material at the end of this article.
**MICROSOFT HAS** had a long, a very long history of litigation, court orders, patent infringements and antitrust lawsuits against it since the very beginning of its history. We;ve managed to draw up a partial list of these.

The surprising thing is not only the number of those lawsuits against Microsoft - at one time, it had more than 130 pending - but more importantly, the sheer amount of money it represents.

The Redmond giant has been ordered to pay nearly $9 billion, a figure which is set to rise with some lawsuits still to be ruled on.

This covers everthing from the miniscule $2 million paid to the state of Iowa, as a fine following the 1999 lawsuit against MS for overcharging customers, to the huge $2 billion one paid to the Enemy, Sun Microsystems.

Some notable points that emerged during my research.

1. Many of the lawsuits, especially the federal ones, were settled with Microsoft giving away free vouchers and free software for the educational sector in those states. Some have argued that the 1999 lawsuit was a trojan horse to break the hold of Apple on that market.

2. Microsoft has several times invested in the companies which have sued it. AT&T - where they threw in $5 billion, Apple - $150 million and Immersion - $26 million.

3. Though Microsoft is keen to emphasise the fact that they are not guilty of any wrongdoing in many of the lawsuits, they would prefer to pay rather than anything else. This has lead some observers to speculate that fines has been a way to "oil" the progress of Microsoft. Note also that no one has been imprisoned and that apart from paying out huge amounts of money, Microsoft can carry on its business as usual.

· Print Version                                                                                                    Pa

4. The amount of money paid by Microsoft for PR and for the lawsuits
by itself is in the region of $500 million during the past 10 years.

5. The monies to be paid are often distributed through vouchers and
therefore, the sums below are maximums rather than effectively paid
as a sizeable part of those vouchers goes uncollected.

To date, there are 48 lawsuits that have been documented online, 39
of which have had the fines clearly defined and the rest either to be
decided or with undisclosed fines. Below is the complete list in
alphabetical order. If there is any lawsuit that I missed or any other
information or amounts that are incorrect, please do inform me. μ

| Alacritech | Undisclosed | Kansas | $32,000,000 |
|---|---|---|---|
| AOL | $750,000,000 | Maryland | $10,500,000 |
| Apple | $250,000,000 | Massachusetts | $34,000,000 |
| Arizona | $104,600,000 | Minnesota | $240,000,000 |
| AT&T | Undisclosed | Montana | $12,300,000 |
| Be | $23,250,000 | Mythic | Still in court |
| Bristol | $4,100,000 | Nebraska | $22,600,000 |
| Burst | $60,000,000 | New Mexico | $3,150,000 |
| California | $1,100,000,000 | North Carolina | $89,000,000 |
| Carlos Armando (1) | $8,960,000 | North Dakota | $9,000,000 |
| Columbia | $6,200,000 | Novell | $536,000,000 |
| Discrimation Suit (2) | Still in court? | Private (5) | $10,500,000 |
| DR DOS/Caldera | $500,000,000 | Real | Still in court |
| Employee fired (3) | $ 9,000,000 | Sendo | Undisclosed |
| Eolas | $521,000,000 | South Dakota | $9,330,000 |
| EU | $613,000,000 | Daum (4) | $8,600,000 |
| Florida | $202,000,000 | SPX | $62,000,000 |
| Forgent | Still in court | Stac | $83,000,000 |
| Gateway | $150,000,000 | Sun | $1,950,000,000 |
| Go | Still in court | Perma Te | $96,000,000 |
| IBM | $850,000,000 | Tennessee | $64,000,000 |
| Immersion | $35,000,000 | Vermont | $9,700,000 |
| Intertrust | $440,000,000 | Wordperfect | Still in court |
| Iowa | $2,000,000 | E-data | Still in court |

(1) Carlos Armando is a Guatamalan inventor. The lawsuit was over a
method to "transfer data between Microsoft Excel and Microsoft Access
using a single spreadsheet."

Exhibit 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICROSOFT CORPORATION, a Washington corporation, | ) |
| | ) |
| Plaintiff, | ) Case No. 04 C 7687 |
| | ) |
| v. | ) Judge James B. Moran |
| | ) |
| BRA SOFT CORPORATION, an Illinois corporation d/b/a BRA LIMITED; and ALEKS RECHANIK, an individual, | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF MICROSOFT CORPORATION'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES

Plaintiff Microsoft Corporation ("Microsoft") responds to defendants' First Set of

Interrogatories as follows:

### INTERROGATORY NO. 1:

Identify every person with knowledge of the facts alleged in Microsoft's Complaint and

state the subject matter of each such person's knowledge.

### RESPONSE TO INTERROGATORY NO. 1:

Microsoft objects to this Interrogatory to the extent it seeks information protected by the

attorney-client privilege, the work product doctrine and/or any other applicable privilege.

Microsoft further objects to this Interrogatory to the extent that it seeks information that is a trade

secret or proprietary information concerning Microsoft's business, or other information that

Microsoft is under an obligation to or finds necessary to keep confidential.

Subject to and without waiving its objections, Microsoft responds as follows:

## RESPONSE TO INTERROGATORY NO. 2:

Microsoft objects to this Interrogatory on the grounds that it is over broad as to time, unduly burdensome, and seeks information that is equally available to and/or in the possession, custody, and control of Defendants. Microsoft also objects to this Interrogatory on the grounds it is vague and ambiguous.

Subject to and without waiving its objections, Microsoft responds that the following communications have taken place since the dismissal of the previous case against Aleks Rechanik d/b/a Altim International Trading Co. and Aleks Rechanik, an individual:

Microsoft delivered two letters to Defendants, one of which was dated May 17, 2004 and the other which was erroneously dated May 17, 2005, demanding that Defendants cease and desist from their distribution of counterfeit Microsoft software and related components. The letters were delivered to a man who identified himself as Aleks, the owner of ERA Soft. Aleks stated that he had dealings with Microsoft in the past, that he had once resided in Cleveland, Ohio and operated a business, Ultimate Integration. When asked to discuss Defendants' recent distributions of counterfeit Microsoft software and COA labels, Aleks stated that ERA Soft would go out of business and did not wish to discuss the matter further. Microsoft refers Defendants to Microsoft's Rule 26(a)(1) Initial Disclosures, which included copies of these cease and desist letters.

On or about May 18, 2004, a Microsoft representative, Jean Agnew, telephoned Defendants to discuss the May 17, 2004 cease and desist letters. Ms. Agnew explained the purpose of her call, and Defendants ended the phone call.

Microsoft further responds that although the investigators who acquired the counterfeit and/or infringing Microsoft software and components from Defendants are not Microsoft's "employees, attorneys, accountants, representatives, consultants [or] agents," Microsoft refers

Defendant Aleks Rechanik has knowledge of: Defendants' acquisition and distribution of counterfeit Microsoft software and components; and the lawsuit filed against him by Microsoft on or about April 22, 1999, in the United States District Court for the Northern District of Ohio, Case No. 1-99-CV-0965-KMO, including the judgment and permanent injunction entered against him.

Kristi Bankhead, Microsoft Corporation, who may be contacted through Microsoft's counsel, has knowledge of the counterfeit nature of the Microsoft software and components distributed by Defendants. This includes, but is not limited to, the Microsoft Windows 2000 Professional ("Windows 2000 Pro") Certificate of Authenticity ("COA") labels and the Microsoft Windows 98 COA labels distributed by Defendants to an investigator on or about September 21, 2004.

Anita Rea, Intellectual Property Services, Inc., who may be contacted through Microsoft's counsel, has knowledge of: the counterfeit nature of the counterfeit Microsoft Office 97 (Professional Edition) ("Office Pro 97") software and/or components distributed by Defendants to an investigator on or about December 15, 2002; and the counterfeit nature of the counterfeit Windows 2000 Pro COA labels and Microsoft Windows 98 COA labels distributed by Defendants to an investigator on or about April 22, 2004.

Gordon Sippell, Intellectual Property Services, Inc., who may be contacted through Microsoft's counsel, has knowledge of the counterfeit nature of the counterfeit Office Pro 97 software and/or related components, the counterfeit Windows 2000 Pro COA label, and a stolen Windows 2000 Pro COA label that were distributed by Defendants to an investigator on or about February 6, 2003.

Doug Cunningham, Pinkerton Consulting & Investigations, 5000 Executive Parkway, Suite 145, San Ramon, California 94583, has knowledge of: Defendants' distribution to an

Defendant Aleks Rechazik has knowledge of: Defendants' acquisition and distribution of counterfeit Microsoft software and components; and the lawsuit filed against him by Microsoft on or about April 22, 1999, in the United States District Court for the Northern District of Ohio, Case No. 1-99-CV-0965-KMO, including the judgment and permanent injunction entered against him.

Kristi Beckhead, Microsoft Corporation, who may be contacted through Microsoft's counsel, has knowledge of the counterfeit nature of the Microsoft software and components distributed by Defendants. This includes, but is not limited to, the Microsoft Windows 2000 Professional ("Windows 2000 Pro") Certificate of Authenticity ("COA") labels and the Microsoft Windows 98 COA labels distributed by Defendants to an investigator on or about September 21, 2004.

Anita Rea, Intellectual Property Services, Inc., who may be contacted through Microsoft's counsel, has knowledge of: the counterfeit nature of the counterfeit Microsoft Office 97 (Professional Edition) ("Office Pro 97") software and/or components distributed by Defendants to an investigator on or about December 15, 2002; and the counterfeit nature of the counterfeit Windows 2000 Pro COA labels and Microsoft Windows 98 COA labels distributed by Defendants to an investigator on or about April 22, 2004.

Gordon Sippell, Intellectual Property Services, Inc., who may be contacted through Microsoft's counsel, has knowledge of the counterfeit nature of the counterfeit Office Pro 97 software and/or related components, the counterfeit Windows 2000 Pro COA label, and a stolen Windows 2000 Pro COA label that were distributed by Defendants to an investigator on or about February 6, 2003.

Doug Cunningham, Pinkerton Consulting & Investigations, 5000 Executive Parkway, Suite 145, San Ramon, California 94583, has knowledge of: Defendants' distribution to an

investigator of counterfeit Office Pro 97 and/or related components on or about December 15, 2002; and Defendants' distribution to an investigator of counterfeit Office Pro 97 and/or related components and a counterfeit Windows 2000 Pro COA label, and a possibly stolen Windows 2000 Pro COA label on or about February 6, 2003.

Keagan Patrick, National Trademark Investigations, 11444 Washington Blvd. #119, Los Angeles, California 90066, has knowledge of Defendants' distribution to an investigator of counterfeit Windows 2000 Pro COA labels and counterfeit Microsoft Windows 98 COA labels, on or about April 22, 2004.

John P. Joyce, John P. Joyce Investigative Services, P.O. Box 31241, Independence, Ohio 44131, has knowledge of Defendants' distribution to an investigator of counterfeit Windows 2000 Pro COA labels and counterfeit Windows 98 COA labels on or about September 21, 2004.

Jim Kirby, Kirby & Associates, 783 North York Rd, Elmhurst, IL 60126 has knowledge of the cease and desist letters provided to Defendants dated May 17, 2004.

Defendants' current and/or former employees have knowledge of: Defendants acquisition and/or distribution of counterfeit and/or infringing Microsoft software and components.

Customers and clients to whom Defendants distributed counterfeit and/or infringing Microsoft software and components.

Suppliers to Defendants of counterfeit and/or infringing Microsoft software and components.

Microsoft's discovery and investigation are ongoing.


INTERROGATORY NO. 2:

Fully describe all communications between Microsoft and Aleks Rechanik, ERA Soft, or any corporation in which Microsoft knows Aleks Rechanik to have had an ownership interest.

Rechanik PRO SE pleadings08/v1-20

## RESPONSE TO INTERROGATORY NO. 2:

Microsoft objects to this Interrogatory on the grounds that it is over broad as to time, unduly burdensome, and seeks information that is equally available to and/or in the possession, custody, and control of Defendants. Microsoft also objects to this Interrogatory on the grounds it is vague and ambiguous.

Subject to and without waiving its objections, Microsoft responds that the following communications have taken place since the dismissal of the previous case against Aleks Rechanik d/b/a Altim International Trading Co. and Aleks Rechanik, an individual:

Microsoft delivered two letters to Defendants, one of which was dated May 17, 2004 and the other which was erroneously dated May 17, 2005, demanding that Defendants cease and desist from their distribution of counterfeit Microsoft software and related components. The letters were delivered to a man who identified himself as Aleks, the owner of ERA Soft. Aleks stated that he had dealings with Microsoft in the past, that he had once resided in Cleveland, Ohio and operated a business, Ultimate Integration. When asked to discuss Defendants' recent distributions of counterfeit Microsoft software and COA labels, Aleks stated that ERA Soft would go out of business and did not wish to discuss the matter further. Microsoft refers Defendants to Microsoft's Rule 26(a)(1) Initial Disclosures, which included copies of these cease and desist letters.

On or about May 18, 2004, a Microsoft representative, Jean Agnew, telephoned Defendants to discuss the May 17, 2004 cease and desist letters. Ms. Agnew explained the purpose of her call, and Defendants ended the phone call.

Microsoft further responds that although the investigators who acquired the counterfeit and/or infringing Microsoft software and components from Defendants are not Microsoft's "employees, attorneys, accountants, representatives, consultants [or] agents," Microsoft refers

Defendants to Microsoft's response to Interrogatory No. 3 for information regarding

communications between Defendants and those investigators.

     Microsoft's discovery and investigation are ongoing.


## INTERROGATORY NO. 3:

     Fully describe all investigations performed of Defendants relating to the purchase, sale,

or use of any Microsoft software, certificates of authenticity, or products, including but not

limited to the name of each investigator, the dates each investigative activity took place, the

nature of each such investigative activity, the methodology used for each such investigative

activity, and the results of each such investigative activity.

## RESPONSE TO INTERROGATORY NO. 3:

     Microsoft objects to this Interrogatory to the extent it seeks information protected by the

attorney-client privilege, the work product doctrine and/or any other applicable privilege.

Microsoft further objects to this Interrogatory to the extent that it seeks information that is a trade

secret or proprietary information concerning Microsoft's business, or other information that

Microsoft is under an obligation to or finds necessary to keep confidential.  Microsoft also

objects to this Interrogatory on the grounds that it is over broad as to time and unduly

burdensome.  Microsoft also objects to this Interrogatory on the grounds it is vague and

ambiguous.

     Subject to and without waiving its objections, Microsoft responds that the following

investigations have taken place since the dismissal of the previous case against Aleks Rechanik

d/b/a Altim International Trading Co. and Aleks Rechanik, an individual:

     On or about September 21, 2004, investigator John P. Joyce telephoned ERA Soft at

(847) 726-3008, and spoke with a man who identified himself as Aleks.  The investigator placed

from ERA Soft Corp., 1216 Thorndale Lane, Lake Zurich, Illinois 60047, which contained the items ordered by the investigator, and an invoice, sales receipt, and price list. A Microsoft representative analyzed the items acquired from ERA Soft and determined that the Office Pro 97 software components are counterfeit, the Windows 2000 Pro COA label distributed with the manual is counterfeit, and the manual is non-counterfeit. The Microsoft representative also determined that while the Windows 2000 Pro COA label, CD-ROM, and manual are not counterfeit, they were distributed in an unauthorized manner and the COA label was stolen.

On or about December 15, 2002, investigator Doug Cunningham attended the Giant Computer Show & Sale held at the Tinley Park Convention Center in Tinley Park, Illinois, and visited a booth identified as ERA Soft Corp. The investigator spoke with a male employee and acquired 1 Office Pro 97 CD-ROM without a manual or license for $64.95, and 2 Windows 2000 Pro CD-ROMs without a manual or license for $119.95. The investigator also acquired a price list and an invoice. A Microsoft representative analyzed the software acquired from ERA Soft, and determined that the Office Pro 97 software components are counterfeit. The representative also determined that the Windows 2000 Pro software components are not counterfeit, but were distributed in an unauthorized manner.

In or around October 2001, investigator David Woods, Associated Investigative Services, P.O. Box 420, Lindenhurst, New York 11757, telephoned ERA Limited, and spoke with a man who identified himself as Aleks. The investigator placed an order for 1 unit of Microsoft Office 2000 Professional software for $119.95, two units of Microsoft Windows ME (Millennium Edition) software for $72.95 each, 2 units of Windows 98 software for $53.95 each, and 1 unit of Microsoft Office XP Professional for $149.95. On or about October 29, 2001, a package was delivered from ERA Limited, 1216 Thorndale Lane, Lake Zurich, Illinois 60047, which contained the items ordered by the investigator, and an invoice and sales receipt. A Microsoft

representative analyzed the software acquired from ERA Limited and determined that while the software and software components acquired from ERA Limited are not counterfeit, they were distributed in an unauthorized manner.

On or about October 8, 2001, investigator Doug Cunningham telephoned ERA Limited at (847) 726-3008, and spoke with a man who identified himself as Aleks. The investigator placed an order for 1 unit of Office Pro 97 without a manual for $59.00, and 1 unit of Windows 98 software without a manual for $53.00. On or about October 22, 2001, a package was delivered from ERA Limited, 1216 Thorndale Lane, Lake Zurich, Illinois 60047, which contained the items ordered by the investigator, and an invoice and sales receipt. A Microsoft representative analyzed the software acquired from ERA Limited and determined that the Windows 98 CD-ROM is counterfeit. The Microsoft representative also determined that the Office Pro 97 software is not counterfeit, but was distributed in an unauthorized manner.

On or about February 25, 2001, investigator Doug Cunningham attended a computer show held at the College of Du Page in Glen Ellyn, Illinois, and visited a booth identified as ERA Limited. The investigator spoke with a male employee and acquired 1 Office Pro 97 CD-ROM without a manual or license for $61.00. The investigator also acquired a price list and an invoice. A Microsoft representative analyzed the Office Pro 97 software acquired from ERA Limited and determined that the software is not counterfeit, but was distributed in an unauthorized manner.

On or about December 13, 2000, an investigator with Pinkerton Consulting & Investigations, Craig Maurer, telephoned ERA Limited at (847) 726-3008, and spoke with a man who identified himself as Aleks. The investigator placed an order for 1 unit of Office Pro 97 for $40.00 and 1 unit of Windows 95 software for $20.00. On or about January 10, 2001, a package was delivered from Aleksandr Rechanik, 1216 Thorndale Lane, Lake Zurich, Illinois 60047,

which contained the items ordered by the investigator. A Microsoft representative analyzed the software distributed by Aleksandr Rechankik, and determined that the Windows 95 software components are not counterfeit, but were distributed in an unauthorized manner. The Microsoft representative also determined that the Office Pro 97 software components are counterfeit.

On or about May 28, 2000, an investigator with Pinkerton Consulting & Investigations, Alex Gomez, attended a computer show held at the College of Du Page in Glen Ellyn, Illinois. The investigator visited a booth identified as ERA Limited, and spoke with a man who identified himself as Aleks. The investigator acquired 1 unit of Windows 95 software for $35.00. A Microsoft representative analyzed the software distributed by ERA Limited and determined that the Windows 95 software is not counterfeit, but was distributed in an unauthorized manner.

Microsoft's discovery and investigation are ongoing.


## INTERROGATORY NO. 4:

Fully describe any investigations performed of Defendants that concluded either that the software, certificates of authenticity, or products were genuine or that the investigators could not determine whether or not such software, certificates of authenticity, or products were genuine.

## RESPONSE TO INTERROGATORY NO. 4:

Microsoft objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege, the work product doctrine and/or any other applicable privilege. Microsoft further objects to this Interrogatory to the extent that it seeks information that is a trade secret or proprietary information concerning Microsoft's business, or other information that Microsoft is under an obligation to or finds necessary to keep confidential. Microsoft also objects to this Interrogatory on the grounds that it is over broad as to time and unduly

<u>INTERROGATORY NO. 12:</u>

Identify by case name, case number, and jurisdiction any court orders, whether final or in rulings on motions for temporary injunctive relief, in which a court has invalidated, limited or restricted any of the copyrights or trademarks described in your Complaint.

<u>RESPONSE TO INTERROGATORY NO. 12:</u>

Microsoft objects to this Interrogatory on the grounds that it is over broad, unduly burdensome, and seeks information that is not relevant to the claims at issue in this action and is not likely to lead to the discovery of admissible evidence. Microsoft also objects to this Interrogatory on the grounds it is vague and ambiguous. Microsoft further objects to this Interrogatory to the extent it seeks publicly available information.

DATED: June 3, 2005.

MICROSOFT CORPORATION,

By: _____
One of Its Attorneys

Eric D. Brandfonbrener
Ryan B. Whitacre
PERKINS COIE LLP
131 South Dearborn Street
Suite 1700
Chicago, IL 60603-5559
Telephone: (312) 324-8400
Facsimile: (312) 324-9400

Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICROSOFT CORPORATION, a Washington
corporation,

        Plaintiff,

v.

ERA SOFT CORPORATION, an Illinois
corporation d/b/a ERA LIMITED; and ALEKS
RECHANIK, an individual,

        Defendants.

)
)
)
)
)  Case No.  04 C 7687
)
)  Judge James B. Moran
)
)
)
)
)
)
)

**DECLARATION OF DOUG CUNNINGHAM IN SUPPORT OF PLAINTIFF
MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT AGAINST
DEFENDANTS ERA SOFT CORPORATION D/B/A ERA LIMITED AND ALEKS
RECHANIK**

I, Doug Cunningham, declare as follows:

1.　　I am employed by Pinkerton Consulting & Investigations ("Pinkerton"), a licensed private investigative agency. In the ordinary course of Pinkerton's business, the duties for which I am responsible include acquiring software and hardware from various companies, receiving packages delivered to Pinkerton connection with orders I have placed, opening and inspecting these packages, and forwarding the packages to the appropriate client(s). Based on these duties and responsibilities, I have gained and have personal knowledge of the facts set forth below, and if called upon to testify, I could do so competently and truthfully.

2.　　On or about December 15, 2002, I went to the Giant Computer Show & Sale at the Tinley Park Convention Center in Tinley Park, Illinois. I went to a table identified as Era Soft Corp. and purchased, among other things, one unit of purported Microsoft Office 97 Professional Edition ("Office Pro 97") software. Attached to this declaration as Exhibit 1 are true and correct copies of the sales receipt bearing the name Era Limited that I received for the transaction and an Era Soft Corp. price list that I received.

3.　　In the ordinary course of Pinkerton's business, it is the regular practice for the investigators who order software or hardware from various companies to report or document the software and/or hardware acquisition at or near the time of the events described. With respect to orders of software or hardware made for Microsoft Corporation ("Microsoft"), in the ordinary course of Pinkerton's business, Pinkerton sends to a Microsoft representative a copy of the investigation report, including copies of the documentation received with an order, as well as any software received. I caused the investigation report, including copies of the documentation received with the order, as well as the software I received from ERA Soft Corp. in December 2002, to be sent to a Microsoft representative.

4.    On or about February 6, 2003, I telephoned ERA Soft Corporation at (847) 726-3008 and spoke with a man who identified himself as "Alex." I placed an order for one unit of purported Office Pro 97 software and two units of purported Microsoft Windows 2000 Professional ("Windows 2000 Pro") software. "Alex" agreed to ship the order to me at the address I provided.

5.    On or about February 14, 2003, I received a package. The return address label affixed to the package indicated it was sent from ERA Soft Corporation, 1216 Thorndale Lane, Lake Zurich, Illinois 60047. Attached to this declaration as Exhibit A is a true and correct copy of the return address label that was affixed to the package sent from ERA Soft Corporation. The package was unopened and still sealed when I received it. I opened the package and inspected its contents. The package from ERA Soft Corporation contained the order I had placed on or about February 6, 2003 for two units of purported Windows 2000 Pro software and one unit of purported Office Pro 97 software, as well as sales receipts bearing the name Era Limited and an Era Soft Corp. price list. Attached to this declaration as Exhibit B are true and correct copies of the sales receipts and price list that were enclosed in the package I received from ERA Soft Corporation. Thereafter, I caused the investigation report, including copies of the documentation received with the order, as well as the software I received from ERA Soft Corporation in February 2003, to be sent to a Microsoft representative.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this  20th  day of September 2006.

Doug Cunningham

Exhibit 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICROSOFT CORPORATION, a Washington
corporation,

          Plaintiff,

v.

ERA SOFT CORPORATION, an Illinois
corporation d/b/a ERA LIMITED; and ALEKS
RECHANIK, an individual,

          Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.  04 C 7687

Judge James B. Moran

**DECLARATION OF KEAGAN PATRICK IN SUPPORT OF PLAINTIFF MICROSOFT CORPORATION'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS ERA SOFT CORPORATION D/B/A ERA LIMITED AND ALEKS RECHANIK**

I, Keagan Patrick, declare as follows:

1.      I was formerly employed by National Trademark Investigations ("NTI"), a licensed private investigative agency. In the ordinary course of NTI's business, the duties for which I was responsible included acquiring software and hardware from various companies, receiving packages delivered to NTI's office in Los Angeles, California from NTI's mailbox service, opening and inspecting these packages, and forwarding the packages to the appropriate client(s). Based on these duties and responsibilities, I have personal knowledge of the facts set forth below, and if called upon to testify I could do so competently and truthfully.

2.      On or about April 22, 2004, I telephoned ERA Soft Corporation at (847) 726-3008 and spoke with an unidentified male. I placed an order for one unit of purported Microsoft Windows 2000 Professional ("Windows 2000 Pro") software, ten purported Windows 2000 Pro Certificate of Authenticity ("COA") labels, and two purported Microsoft Windows 98 COA labels. The ERA Soft Corporation employee agreed ship the order to me at the address I provided.

3.      In the ordinary course of NTI's business, NTI has instructed its mailbox service to receive packages on NTI's behalf and ship them unopened and still sealed to NTI's office in Los Angeles, California.

4.      On or about April 30, 2004, a box was delivered to NTI's office from NTI's mailbox service. The shipping label affixed to the package indicated it was sent from ERA Soft Corp., (847) 726-3008, Thorndale Lane, Lake Zurich, Illinois 60047-2763. Attached to this declaration as Exhibit A is a true and correct copy of the shipping label that was affixed to the package sent from ERA Soft Corp. The package was unopened and still sealed when it was received at NTI's office. I opened the package and inspected its contents. The package from ERA Soft Corp. contained the order I had placed on or about April 22, 2004 for one unit of

purported Windows 2000 Pro software, ten purported Windows 2000 Pro COA labels, and two

purported Windows 98 COA labels, as well as sales receipts bearing the name Era Limited and

an Era Soft Corp. price list. Attached to this declaration as Exhibit B are true and correct copies

of the sales receipts and price list that were enclosed in the package I received from ERA Soft

Corp.

5.    In the ordinary course of NTI's business, it is the regular practice for the

investigators who order software or hardware from various companies to report or document the

software and/or hardware acquisition at or near the time of the events described. With respect to

orders of software or hardware made for Microsoft Corporation ("Microsoft"), in the ordinary

course of NTI's business, NTI sends to a Microsoft representative a copy of the investigation

report, including copies of the documentation received with an order, as well as any software

received. I caused the investigation report, including copies of the documentation received with

the order, as well as the software I received from ERA Soft Corp. in April 2004, to be sent to a

Microsoft representative.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct. Executed this 23 day of September 2006.

Exhibit  5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICROSOFT CORPORATION, a Washington )
corporation,                        )
                                    )
            Plaintiff,              )    Case No.  04 C 7687
                                    )
v.                                  )    Judge James B. Moran
                                    )
ERA SOFT CORPORATION, an Illinois   )
corporation d/b/a ERA LIMITED; and ALEKS )
RECHANIK, an individual,            )
                                    )
            Defendants.             )

**DECLARATION OF JOHN JOYCE IN SUPPORT OF PLAINTIFF MICROSOFT
CORPORATION'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS
ERA SOFT CORPORATION D/B/A ERA LIMITED AND ALEKS RECHANIK**

I, John Joyce, declare as follows:

1.      I was formerly a private investigator who owned John P. Joyce Investigative Services, Inc., a licensed private investigative agency. In the ordinary course of my business, I was responsible for, among other things, acquiring software and hardware from various companies, receiving packages delivered to me connection with orders I placed, opening and inspecting these packages, and forwarding the packages to the appropriate client(s). Based on these duties and responsibilities, I have gained and have personal knowledge of the facts set forth below, and if called upon to testify, I could do so competently and truthfully.

2.      On or about September 21, 2004, I telephoned ERA Soft Corporation at (847) 726-3008 and spoke with a man who identified himself as "Alex." I placed an order for, among other things, five purported Microsoft Windows 2000 Professional ("Windows 2000 Pro") Certificate of Authenticity ("COA") labels and five purported Microsoft Windows 98 COA labels. "Alex" agreed to ship the order to me at the address I provided.

3.      On or about September 24, 2004, I received a package. The return address indicated it was sent from ERA Soft Corp., P.O. Box 955, Lake Zurich, Illinois 60047, telephone number (847) 726-3008. Attached to this declaration as Exhibit A is a true and correct copy of the return address on to the package sent from ERA Soft Corp. The package was unopened and still sealed when I received it. I opened the package and inspected its contents. The package from ERA Soft Corp. contained the order I had placed on or about September 21, 2004 for, among other things, five purported Windows 2000 Pro COA labels and five purported Windows 98 COA labels, as well as sales receipts bearing the name Era Limited and an Era Soft Corp. price list. Attached to this declaration as Exhibit B are true and correct copies of the sales receipts and price list that were enclosed in the package I received from ERA Soft Corp.

4.       In the ordinary course of my business, it was my regular practice to document any software and/or hardware acquisition I made at or near the time of the events described.  With respect to orders of software or hardware made for Microsoft Corporation ("Microsoft"), in the ordinary course of my business, I sent to a Microsoft representative a copy of the investigation report, including copies of the documentation received with an order, as well as any software received.  I caused the investigation report, including copies of the documentation received with the order, as well as the software I received from ERA Soft Corp. in September 2004, to be sent to a Microsoft representative.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this ___ day of September 2006.

John Joyce

Exhibit  6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| MICROSOFT CORPORATION, a Washington corporation, | ) |
| | ) |
| Plaintiff, | ) Case No. 04 C 7687 |
| | ) |
| v. | ) Judge James B. Moran |
| | ) |
| ERA SOFT CORPORATION, an Illinois corporation d/b/a ERA LIMITED; and ALEKS RECHANIK, an individual, | ) |
| | ) |
| Defendants. | ) |

## STIPULATED PROTECTIVE ORDER

**WHEREAS** Microsoft Corporation ("Microsoft"), and ERA SOFT Corporation d/b/a/ ERA Limited and Aleks Rechanik (collectively, the "Defendants") are engaged in litigation that will involve the disclosure of confidential, proprietary, technical, business and financial information;

**WHEREAS** the parties seek to preserve their privacy and property interests in such information, without unduly encroaching on the public's right to be informed of judicial proceedings, and recognizing that the party seeking to protect information filed under seal with the Court must show good cause for sealing that part of the record and that either party can challenge any designation of confidentiality pursuant to this Stipulated Protective Order; and

**WHEREAS** the parties and counsel will act in good faith in designating records pursuant to the protections provided by this Stipulated Protective Order;

**IT IS HEREBY STIPULATED** and agreed by and between counsel for the parties that the terms and conditions of this Stipulated Protective Order shall be entered as follows:

1.    This Stipulated Protective Order shall be applicable to and govern all depositions, documents produced in response to requests for production of documents, answers to

~CHI001:30524418.v1

interrogatories, responses to requests for admissions, and all other discovery taken pursuant to

the Federal Rules of Civil Procedure, as well as all documents produced by either party in

response to informal discovery requests, and testimony adduced at trial, matters in evidence and

computerized records (collectively, "RECORDS"), which the disclosing party designates as

"CONFIDENTIAL MATERIAL" or "RESTRICTED MATERIAL" hereafter furnished, directly

or indirectly, by or on behalf of any party in connection with this action.

2.    In designating RECORDS as "CONFIDENTIAL MATERIAL" or

"RESTRICTED MATERIAL," a party shall make such a designation of CONFIDENTIAL

MATERIAL or RESTRICTED MATERIAL only for RECORDS which that party in good faith

believes contain trade secret or other confidential, competitive or proprietary business

information used by it in, or pertaining to, its business which the party takes appropriate efforts

to keep confidential or which the party is otherwise required to keep confidential by agreement

or law.  For a designation of RECORDS as "RESTRICTED MATERIAL," the party must

additionally have in good faith determined that the RECORDS are comprised of or contain

highly sensitive competitive business information.  This information includes, but is not limited

to, the security features of the party's property (e.g., software, hardware and related items),

which if disclosed would facilitate the creation, manufacture, duplication and/or distribution of

counterfeit copies of that party's property.  This also includes information, which if disclosed

would seriously undermine or destroy the party's ability to investigate the counterfeiting of its

property in general or against other parties.  While the RECORDS or portions of the RECORDS

that contain this type of highly sensitive business information may be shown to counsel, they

must otherwise be protected from disclosure to the parties themselves in this litigation, and must

be subject to the restricted disclosure provided below.  CONFIDENTIAL MATERIAL and

RESTRICTED MATERIAL shall be used solely for the purpose of conducting this litigation and

not for any other purpose. No RECORDS which evidence the acquisition or distribution of Microsoft software and/or components thereof by the Defendants, including but not limited to invoices and purchase orders, shall be designated CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL.

3.    RECORDS designated as CONFIDENTIAL MATERIAL may be disclosed only to the following persons:

a.    the attorneys working on this action on behalf of any party, including in-house attorneys;

b.    any paralegal assistants, stenographic and clerical employees working under the direct supervision of such counsel;

c.    any parties to this action who are individuals, and the employees, directors or officers of parties to this action who are corporations or partnerships, to the extent necessary to further the interest of the parties in this litigation;

d.    any person not employed by a party who is expressly retained or sought to be retained by any attorney described in paragraph 3(a) to assist in preparation of this action for trial, with disclosure only to the extent necessary to perform such work;

e.    any witnesses who appear for deposition or trial in this matter, and their counsel of record, during the course of their testimony, upon the witness being advised of the need and agreeing to keep the RECORDS confidential; and

f.    the Court.

4.    RECORDS designated as "RESTRICTED MATERIAL" may be disclosed only to the following persons:

       a.      the attorneys working on this action on behalf of any party, including in-house attorneys;

       b.      any paralegal assistants, stenographic and clerical employees working under the direct supervision of such counsel, with disclosure only to the extent necessary to perform their work in connection with this matter;

       c.      any person not employed by a party who is expressly retained or sought to be retained by any attorney described in paragraph 4(a) to assist in preparation of this action for trial, with disclosure only to the extent necessary to perform such work;

       d.      any witnesses who appear for deposition or trial in this matter, and their counsel of record, during the course of their testimony, upon the witness being advised of the need and agreeing to keep the RECORDS confidential; and

       e.      the Court.

    5.    Notwithstanding any other provisions of this Order, Microsoft may (a) use and disclose CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL in order to investigate and/or prosecute criminal or civil actions involving copyright or trademark infringement against parties or entities other than the defendants in this matter and may provide CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL to law enforcement officials upon such officials' request; and (b) use and disclose RECORDS which indicate or refer to suppliers or purchasers of genuine or purported Microsoft software or any other items or components which bear any of the Microsoft trademarks at issue in this matter for purposes of investigation and institution of civil or criminal proceedings against any party, including parties other than the defendants in this action.

6.     The persons described in paragraphs 3(d) and 4(c) shall have access to the CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL once they have been made aware of the provisions of this Order and have manifested their assent to be bound thereby by signing a copy of the annexed "ACKNOWLEDGMENT." A list shall be prepared by counsel for the parties hereto of the names of all such persons to whom CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL is disclosed, or to whom the information contained therein is disclosed, and such list shall be available for inspection by the Court and opposing counsel upon request.    The other persons described in paragraphs 3 and 4 shall have access to the CONFIDENTIAL MATERIAL and RESTRICTED MATERIAL pursuant to the terms of this Order without signing a copy of the annexed "ACKNOWLEDGEMENT." Similar but separate lists shall also be prepared  with respect to CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL provided by third parties.    At the time of the termination of this lawsuit by settlement, judgment or otherwise, the parties hereto shall provide other counsel with a copy of the pertinent aforementioned lists upon request.    The persons receiving CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL are enjoined from disclosing it to any other person, except in conformance with this Order.  This Stipulation will not require the disclosure of experts other than by Local Rule, Federal Rule of Civil Procedure, and/or Court Order.

7.     Each individual who receives any CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL hereby agrees to subject himself/herself to the jurisdiction of this Court for the purpose of any proceedings relating to the performance under, compliance with or violation of this Order.

8.     The recipient of any CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL that is provided under this Order shall maintain such RECORDS in a secure and

safe area and shall exercise the same standard of due and proper care with respect to the storage, custody, use and/or dissemination of such RECORDS as is exercised by the recipient with respect to its own proprietary information.

       9.    Parties shall designate CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL as follows:

       a.    In the case of RECORDS produced pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, interrogatory answers, responses to requests for admissions, and the information contained therein, designation shall be made by placing the following legend on any such RECORD prior to production: "CONFIDENTIAL MATERIAL" or "RESTRICTED MATERIAL." In the event that a party inadvertently fails to stamp or otherwise designate a RECORD as CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL at the time of its production, that party shall have five (5) business days after discovery of such error to so stamp or otherwise designate the RECORD.

       b.    In the case of depositions, designation of the portion of the transcript (including exhibits) which contains CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL shall be made by a statement to such effect on the record in the course of the deposition or, upon review of such transcript by counsel for the party to whose CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL the deponent has had access, said counsel shall designate within fourteen (14) days after counsel's receipt of the transcript.

       c.    Transcripts of depositions will not be filed with the Court unless it is necessary to do so for purposes of trial, motions for summary judgment, or other matters. If a deposition transcript is filed and if it contains CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL, the transcript shall bear the appropriate legend on the caption page and shall be filed under seal.

10.    A party shall not be obligated to challenge the propriety of a CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL designation at the time made, and failure to do so shall not preclude a subsequent challenge thereto.  In the event that any party to this litigation disagrees at any stage of these proceedings with such designation, such party shall provide to the producing party written notice of its disagreement with the designation.  The parties shall first try to dispose of such dispute in good faith on an informal basis.  If the dispute cannot be resolved, the party challenging the designation may request appropriate relief from the Court, but in any event, such relief from the Court shall not be requested before ten (10) days after the producing party is served with the required notice.  The burden of proving that RECORDS have been properly designated as CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL shall be on the party making such designation.

11.    The Clerk of the Court is directed to maintain under seal all RECORDS and all transcripts of deposition testimony filed with this Court in this litigation by any party which are, in whole or in part, designated as CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL, including all pleadings, deposition transcripts, exhibits, discovery responses or memoranda purporting to reproduce or paraphrase such RECORDS.  The person filing such RECORDS shall designate to the Clerk that all or a designated portion thereof is subject to this Order and is to be kept under seal, except that upon the default of the filing party to so designate, any party may do so.

12.    In the event that any CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL is used in any court proceedings in connection with this litigation, it shall not lose its CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL status through such use, and the parties shall take all steps reasonably required to protect its confidentiality during such use.

13.    Nothing in this order shall preclude any party to the lawsuit, their attorneys or any other person from disclosing or using, in any manner or for any purpose, any RECORDS not obtained in this lawsuit, if such RECORDS are lawfully obtained from a third party, even though the same RECORDS may have been produced in discovery in this lawsuit and designated as CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL.

14.    Nothing in this order shall preclude any party to the lawsuit or their attorneys (a) from showing RECORDS designated as CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL to an individual who either prepared or reviewed the RECORDS prior to the filing of this action, or (b) from disclosing or using, in any manner or for any purpose, RECORDS from the party's own files which the party itself has designated as CONFIDENTIAL MATERIAL or RESTRICTED MATERIAL.

15.    Within sixty (60) days of the termination of litigation between the parties, all CONFIDENTIAL MATERIAL and RESTRICTED MATERIAL, and all copies thereof, except such copies which have been filed with the Court, utilized in accordance with this Order, or which are and will continue to be maintained in a secure place pursuant to the continuing obligations of this Order, shall be returned to the party which produced it or shall be destroyed.

16.    Except as specifically provided herein, the terms, conditions and limitations of this Order shall survive the termination of this action at the option of the designating party.

17.    This Order is without prejudice to the right of any party to seek relief from the Court, upon good cause shown, from any of the provisions contained in paragraphs 1 through 17, inclusive hereof.

18.    The parties affirmatively represent that they will use their best efforts to limit CONFIDENTIAL and RESTRICTED designations to those RECORDS and that information that constitute confidential, competitive business and/or proprietary information.


IT IS SO ORDERED:    May 31, 2005


James B. Moran
United States District Court Judge


Approved as to form and content:


Attorneys for Plaintiff
MICROSOFT CORPORATION


Attorneys for Defendants
ERA SOFT CORPORATION, an Illinois
corporation d/b/a ERA LIMITED; and
ALEKS RECHANIK, an individual


Approved as to form and content:


Attorneys for Plaintiff
MICROSOFT CORPORATION

Dated: _____


Attorneys for Defendants
ERA SOFT CORPORATION, an Illinois
corporation d/b/a ERA LIMITED; and
ALEKS RECHANIK, an individual

Dated:    May 19, 2005

Exhibit 7

53 W. Jackson Blvd  Suite 1620
Chicago, IL 60604
Phone: (312) 834-0609
Fax: (312) 834-0610

Law Offices of
Thaddeus Hunt



| To: | Aleks Rechanik | | From: | Thaddeus J. Hunt |
|-----|----------------|--|-------|------------------|
| Fax: | (847) 726-3068 | | Pages: | 1 |
| Phone: | | | Date: | 5/12/2006 |
| Re: | Microsoft v. Rechanik | | CC: | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● Comments:

Dear Mr. Rechanik:

I wanted to let you know that the deposition of Kristi Bankhead of Microsoft that was tentatively scheduled for June 1, 2006 has been moved to June 22, 2006.  You are permitted to attend the deposition but it is certainly not required.


              Very truly yours,


              Thaddeus J. Hunt

Exhibit **8**

Content-Type: text/plain; charset=iso-8859-15; format=flowed
        To: ThaddeusHunt@LawOfficesofThaddeusHunt.com
    Subject: deposition answer
  X-Priority: 1 (Highest)
        From: Aleks <ara@chicagonet.net>
        Date: Fri, 12 May 2006 16:17:06 -0500
  Message-ID: <opt9glqstqqmmvp7@mail2.chicagonet.net>
  User-Agent: Opera7.01/Win32 M2 build 2651
MIME-Version: 1.0




 Dear  Mr. Hunt.
I got  your info about June.22.2006.
I will there, of course.
What time will start?
Thank's.


Very truly  yours.

 Aleks.

53 W. Jackson Blvd., Suite 1620
Chicago, IL 60604
Phone: (312) 334-0600
Fax: (312) 334-0610

**Law Offices of
Thaddeus Hunt**

# Fax

| | | | |
|---|---|---|---|
| **To:** | Aleks Rechanik | **From:** | Thaddeus J. Hunt |
| **Fax:** | 847-726-3066 | **Pages:** | 12 |
| **Phone:** | | **Date:** | 6/26/2006 |
| **Re:** | Reply to your letter of June 23, 2006 | **CC:** | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

● **Comments:**

Dear Mr. Rechanik:

I am in receipt of your letter dated June 23, 2006. First, let me say that there is nothing "dirty" that is taking place. On May 12, 2006 I notified you of Ms. Bankhead's deposition and of your right to attend. As you will recall, we had a lengthy discussion after your deposition regarding your attendance at Ms. Bankhead's deposition. I indicated to you that because much of the deposition with Ms. Bankhead would involve "restricted" materials, you would not be allowed to attend those portions of the deposition. Further, we discussed that in my opinion it would be futile for you to sit at the deposition and then leave every few minutes when the deposition turned to those restricted materials. As I previously indicated, under the protective order entered by the Court only the attorneys and the party being deposed (in this case Ms. Bankhead) were allowed to be present.

I apologize if there was any confusion; however we must follow the court's order. After I receive the transcript from Ms. Bankhead's deposition, I will try to have the restriction lifted so you can view the full copy of the transcript. I, like you, am not comfortable that you could not be present for the entire deposition; however if we violated the court's order, then we would be subject to being held in contempt by the Court.

In answer to your three questions, my responses are as follows:

1. A copy of the protective order is enclosed herein

2. The transcript from Laura Kooy reporting will not be available for approximately two weeks.

3. The entire software, manuals and COAs subject to the lawsuit were presented at the deposition. They appeared to be in the same form as when they were purchased by the investigators. I will review the full transcript when I receive it to provide you with greater detail.

*That may be the case*

Duplicated    FAX from Law Offices of Thaddeus Hunt, dated 06/25/2006.

Dear Mr. Rechanik :

I am in receipt of your letter dated June 23,2006. First, let me say that there is nothing "dirty" that is taking place. On May 12,2006 I notified you of Ms. Bankhead's deposition and **of you right to attend**. As you will recall,we had a lengthy discussion after your deposition regarding your attendance at Ms. Bankhead's deposition. I indicated to you that because much of the deposition with Ms. Bankhead would involve "restricted" materials, you would not be allowed to attend those portions of the deposition. Further, we discussed that in my opinion it would be futile for you to sit at the deposition and then leave every few minutes when the deposition turned to those restricted materials. As I previously indicated, under the protective order entered by the Court only the attorney's and the party being deposed(in this case Ms.Bankhead) where allowed to be present. **I apologize if there was any confusion**, however we must follow **the court's order.** After I receive the transcript from Ms. Bankhead deposition, I will try to have the restriction lifted so you can view the full copy of the transcript . I, like you, am not comfortable that you could not be present for the entire deposition; however if we violated the court's order , then we would be subject to being held in contempt by the Court.

In answer to you three questions, my responses are as follows:

1.  A copy of the protective order is enclosed herein.

2.  The transcript from Laura Kooy reporting will not be available for approximately two weeks.
3.  The entire software, manuals and COAs subject to the lawsuit were presented at the deposition. They appeared to be in the same form as when they were purchased by investigators. I will review the full transcript when I receive it to provide you with greater detail.

Exhibit 9

nition of confidential - Merriam-Webster Online Dictionary                                    Page



Merriam-Webster Online
○ Dictionary
○ Thesaurus

Browse by letter:
A B C D E F G H I J K L M
N O P Q R S T U V W X Y Z
Browse words next to:
confidential

# confidential

One entry found for **confidential**.

Main Entry: **con·fi·den·tial**
Pronunciation: "kän-f&-'den(t)-sh&l
Function: *adjective*
1 : marked by intimacy or willingness to **confide** <a *confidential* tone>
2 : **PRIVATE**, **SECRET** <*confidential* information>
3 : entrusted with **confidences** <a *confidential* clerk>
4 : containing information whose unauthorized disclosure could be prejudicial to the national interest -- compare **SECRET**, **TOP SECRET**
- **con·fi·den·ti·al·i·ty** /-"den(t)-shE-'a-l&-tE/ *noun*
- **con·fi·den·tial·ly** /-'den(t)-sh{&-}lE/ *adverb*



Visit Britannica.com for **more information on "confidential"**

Get the **Top 10 Search Results for "confidential"**

**Ads by Google**

**Whistleblowing**
24/7 Confidential & International Lines. European Market Leaders.
www.expolink.co.uk

**Affordable Transcription**
Reliable Confidential Accurate 866 375-2441 24/7 Not Hiring
www.chromolumeinc.com

**Norton™ Confidential 2007**
New! Norton Confidential from Symantec safeguards your info.
www.symantec.com



# Merriam-Webster OnLine

... FOR KIDS ... BRITANNICA

... ONLINE ... COLLEGIATE ... UNABRIDGED

Merriam-Webster Online
● Dictionary
○ Thesaurus

Browse by letter:
A B C D E F G H I J K L M
N O P Q R S T U V W X Y Z

Browse words next to:
restriction

## restriction

One entry found for **restriction**.

**Main Entry:** re·stric·tion
**Pronunciation:** ri-'strik-shən
**Function:** *noun*
**Etymology:** Middle English *restriccioun*, from Anglo-French *restriction*, from Late Latin *restriction-, restrictio,* from Latin *restringere*
1 : something that <u>restricts</u> : as **a** : a regulation that <u>restricts</u> or restrains <*restrictions* for hunters> **b** : a limitation on the use or enjoyment of property or a facility
2 : an act of <u>restricting</u> : the condition of being <u>restricted</u>



Visit Britannica.com for <u>**more information on "restriction"**</u>

Get the <u>**Top 10 Search Results for "restriction"**</u>

Ads by Google

**Whole Genome Sequencing**
Ultra fast de novo sequencing as base for comparative genomics
www.roche-applied-science.com

**Zero Restriction Rainwear**
at The Golf Warehouse. Great Service, Selection, & Prices..
TGW.com

**Digestive Enzymes**
Digestive Enzyme products, articles, ideas and more.
puristat.com

Exhibit 10

rinter friendly version of: News: Lobbygate's Gateses (Seattle Weekly)

# SEATTLEWEEKLY

# Lobbygate's Gateses
The coincident D.C. connections of the lawyer father and the software-titan son.

By Rick Anderson

It's hard to miss the irony. Fallout from Lobbygate, the political scandal generated by former lobbyists for the Seattle law firm bearing the name of co-founder William H. Gates II, is affecting the political fortunes of the Redmond software company co-founded by William H. Gates III.

The illegal influence peddling of Jack Abramoff and Michael Scanlon, former lobbyists for Preston Gates Ellis, has led to the announced closure of a scandal-scarred D.C. lobbying arm of a firm employed by Microsoft. The Alexander Strategy Group, which undertook $315,000 worth of lobbying for Microsoft the past few years, says it will get out of the lobbying business because of direct ties to the disgraced Abramoff and now-deposed-and-indicted House Majority Leader Tom DeLay, R-Texas. Two Alexander Strategy Group Republican lobbyists are prominent figures in the scandal and make up part of an inner circle of ethically challenged GOP lobbyists and consultants who have worked for both Microsoft and Preston Gates Ellis.



**EXTRA INFO**

A Rabbi's 'Regret'

Daniel Lapin finally explains his relationship with Jack Abramoff.

Lobbygate's cause and effect is the latest example of how small the political world is in power-happy D.C., where the software giant regularly teams up with its Seattle-based law and lobbying partner to seek favorable corporate legislation. Microsoft has paid Preston Gates Ellis $1.98 million in lobbying fees since 1998, according to their latest filings. That includes $60,000 the first half of last year for work by Preston Gates Ellis lobbyist Slade Gorton, the former U.S. senator from Washington state. He lobbied his old friends in the Senate on Internet regulation sought by Microsoft.

Neither Microsoft nor Preston Gates Ellis has been accused of any wrongdoing in connection with Lobbygate. Their spokespersons would say little about the business or familial relationships of the two Gates entities. "William H. Gates Sr. was never a registered lobbyist and was not involved in the policy practice at Preston Gates & Ellis," according to a statement from the firm. The junior Gates is directly involved in Microsoft operations, while his father, a 1990 founding partner of the law firm, has been semiretired in recent years. The elder Gates also is co-chair of the Bill & Melinda Gates Foundation and is a University of Washington regent.

The law firm and software company shared an especially parallel universe in election year 2000. That's when former Christian Coalition leader Ralph Reed was paid by both, with questionable results. Reed was helping coordinate the George W. Bush presidential campaign when Microsoft put his Atlanta consulting firm, Century Strategies, on a $20,000-

Printer friendly version of: News: Lobbygate's Gateses (Seattle Weekly)

a-month retainer to push for settlement of the landmark antitrust lawsuit against Microsoft. Reed's effort included urging Christian supporters to write his candidate, Bush, in support of his client, Microsoft. Reed later apologized for any "misperception" that it might have caused.

Reed was also on a Microsoft retainer as a "consultant" during the 2004 Bush election but was dropped last summer after his name began to surface in connection with Preston Gates Ellis and Lobbygate. He had been brought aboard Preston Gates Ellis as a subcontractor in 1999 by his friend and political ally, Abramoff. The two, in concert with another mutual friend, Grover Norquist, the GOP antitax guru who is also an ex-- Microsoft lobbyist, launched a plan to funnel millions of dollars in Indian casino gambling money to Reed's firm to pay for an *antigambling* effort being run by Reed in the South. The initial money to launch the antigambling drive, $121,000, came from Preston Gates Ellis and was authorized by the Seattle headquarters, according to Senate documents. Norquist, who is now a consultant for Microsoft, has confirmed he helped launder subsequent funds to Reed that were passed to him by Abramoff from Preston Gates Ellis clients. Preston Gates Ellis says it wasn't fully aware of the money transfers.

Lobbygate is only the latest example of the Gates-Gates relationship. Abramoff, who worked for Preston Gates Ellis from 1994 through 2000, and whose lobbying clients back then included Microsoft, has confessed to federal charges of conspiracy, mail fraud, and tax evasion that date back in part to his Preston Gates Ellis days. He and Scanlon, a onetime DeLay aide who worked at Preston Gates Ellis in 2000 and recently pleaded guilty to corrupting public officials, have both agreed to name members of Congress and staffers who might have received favors or bribes in return for legislation. Abramoff's crimes from 1997 through 2004 include the period he worked at Preston Gates Ellis and for a second firm, Greenberg Traurig of Miami.

At Alexander Strategy Group, the firm that's closing its lobbying shop, Microsoft lobbyists Ed Buckham and Tony Rudy are former DeLay aides who worked independently with Abramoff while he was at Preston Gates Ellis. Buckham has been identified in congressional records as attempting to help Abramoff rig an election for Preston Gates Ellis clients in the Commonwealth of the Northern Marianas Islands. On Wednesday, Jan. 11, five House Democrats asked U.S. Attorney General Alberto Gonzales to look further into that and other incidents involving Abramoff's work for the Marianas. Rudy, though not named, is said to be "Staffer A," singled out in Abramoff's Jan. 3 felony plea agreement as the person who benefited from a $50,000 kickback from Abramoff in 2000. Prosecutors say the money was washed through a Mercer Island charity, Toward Tradition, on whose board Abramoff sat. (See "A Rabbi's 'Regret,'" below.) The $50,000 came from two of Abramoff's Preston Gates Ellis clients. They and the firm deny any knowledge of the scheme.

Microsoft has little to say about its quest for D.C. influence. "Over the course of the last several years," says Ginny Terzano of Microsoft's D.C. office, "we've made it policy not to talk about our lobbying activities or any consultants we may have on retainer." Facing the antitrust charges, the company powered up D.C. operations and stepped into the middle of hardball politics around 1999, broadening its reach with a new in-house lobbying team. Microsoft laid out $23.6 million for in-house and third-party lobbying from 1999 through the first half of 2005, according to a new accounting of federal lobbying disclosure records. About $1.7 million of that was spent on outside firms from July 2004 through July 2005. Microsoft dramatically increased campaign contributions in recent years, too, doling out $13.9 million in corporate and individual-employee donations from 1998 through 2005, according to the Center for Responsive Politics. Gates also expanded what might be seen as politically connected donations, such as the $100,000 his Bill & Melinda Gates Foundation gave in 2003 to the DeLay Foundation for Kids, operated by the congressman now charged with campaign money laundering.

Exhibit  11

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICROSOFT CORPORATION,                )    CASE NO. 1:99-CV-0965
                                      )
                        Plaintiff,    )    JUDGE KATHLEEN M. O'MALLEY
                                      )
            v.                        )
                                      )
ALEKS RECHANIK d/b/a ALTIM            )
INTERNATIONAL TRADING CO.,            )    SATISFACTION OF JUDGMENT
et al.,                               )
                                      )
                        Defendants.   )

Plaintiff Microsoft Corporation ("Microsoft"), by and through its counsel, certifies that

Defendants and Judgment Debtors Aleks Rechanik and Aleks Rechanik d/b/a Altim International

Trading Co. ("Defendants") have satisfied in full the judgment rendered against them in this case

and that the judgment liens filed in Cuyahoga County, Ohio and Lake County, Illinois pursuant

to that judgment are being released.

Respectfully submitted,

David C. Weiner (#0013351)
Michael J. Garvin (#00253940)
Elizabeth Welch Andrews (#0067514)

OF COUNSEL:

HAHN LOESER & PARKS LLP

3300 BP Tower
200 Public Square
Cleveland, Ohio 44114-2301
(216) 621-0150

Attorneys for Plaintiff Microsoft
Corporation

### FULL AND FINAL RELEASE OF ALL CLAIMS

FOR THE SOLE CONSIDERATION OF FIFTY THOUSAND DOLLARS ($50,000.00) receipt of which is acknowledged, *Microsoft Corporation* hereby fully and forever releases and discharges *Aleks Rechank/d/b/a Altima International Trading Co*, their heirs, administrators, executors, successors and assigns, affiliates, shareholders, and all other persons and organizations who are or might be liable, from all claims for all damages arising out of the law suit filed by *Microsoft Corporation*, styled Microsoft Corporation v. Aleks Rechnik d/b/a/ Altima International Co and Aleks Rechnik, case No. 1:99 CV 966.

Further: upon receipt of said monies, *Microsoft Corporation* will, in a seasonably timely manner, execute and record any and all documents to release any and all encumbrances placed by *Microsoft Corporation* on any realty commonly known as 1216 Thorndale Lane, Lake Zurich, Illinois 60047. Specifically, *Microsoft Corporation* will release any encumbrance on said realty with document no. 4624562, or any other document number, so long as said encumbrance was placed on the realty by *Microsoft Corporation* as a result of the above referenced litigation.

By executing this release, *Microsoft Corporation* intends and agrees that this release applies to all of its claims arising from the above referenced litigation, present and future, including, but not limited to, compensatory or punitive damages levied against the defendants therein, claims for known or unknown injuries, developments, consequences and permanency of those damages or injuries; and there is no misunderstanding in this regard.

*Microsoft Corporation* acknowledges the sum paid shall not be construed as an admission of any liability by any of the parties released.

*Microsoft Corporation* agree that if more than one person has executed this release, or any person that is an agent of *Microsoft Corporation*, the consideration paid shall apply jointly to all such persons. Any such person executing this release acknowledges that he or she is a duly registered agent of *Microsoft Corporation*, and has the authority from same to execute this release. The word "person" as used in this paragraph includes natural persons, firms, associations, organizations and corporations.

*Microsoft Corporation* acknowledges that it had the benefit of counsel prior to executing this release, and understand that this release contains the entire agreement between the parties.


Signed and sealed at _____Chicago, Illinois_____ , __May 3, 2002__
                              (City, State)                                    (Date)


In the Presence of Witnesses Signed Below:          CAUTION: READ BEFORE SIGNING,
        THEN SIGN BELOW

_Cynthia D. Marten_

_____          as to ___Janice A. Block___ (Signature)
                                         BY:

_____

_____          as to _____ (Signature)
                                         BY: